In the Matter of the Estate of SARAH LOUISE BLAKE, Deceased.

Surrogate's Court, Kings County, March 3, 1933.

*King, Barr & Robbins,* for Central Hanover Bank and Trust Company.

*Wrenn & Schmid,* for Elizabeth Blake King.

WINGATE, S. The chief attack by the respondent upon the administration of the accountant in this proceeding concerns the alleged impropriety of certain investments of the principal and accumulated income of the trust. The trustee has replied that the particular type of securities in which the questioned investments were made is within the language of sections 111 of the Decedent Estate Law and 21 of the Personal Property Law and argues that no further demonstration of propriety is necessary. The main question at issue is as to whether, on the facts of the case, this is sufficient as a matter of law.

The testatrix died on January 12, 1919, and her will and two codicils were admitted to probate in this court on the thirtieth of the following April. By the second codicil a portion of the remainder of her estate was erected into a trust of which the Union Trust Company of New York was named as trustee, to invest and accumulate the income during the minority of her grandchild, Elizabeth Blake King, and when the latter " shall attain the age of twenty-one years," " to pay over and deliver to " her such principal and accumulations. At the time of testatrix's death the named trustee had been merged in the Central Union Trust Company which was subsequently absorbed in the present accountant, the Central Hanover Bank and Trust Company. It is alleged by the accountant that each of these mergers continued in the successor corporations " all the rights, power, duties and obligations " of the several predecessors, and it is an unquestionable legal fact that they served in all respects to continue the previously existing corporate personalities. (Banking Law, § 494; *Matter of Bergdorf,* 206 N. Y. 309, 314, 318.)

At the time of the probate of the will the present objector was eight years of age, having been born on January 20, 1911, which fact was known to the trustee. This appears from the categorical affidavit of B. A. Morton, the vice-president of the Central Union Trust Company, verified April 1, 1919, and filed in this court about

that time, of which this court may take judicial notice. (*Matter of Morningstar*, 143 Misc. 620, 623.)

The trust here in question was erected on May 28, 1920, by the payment by the executor to itself as trustee of the sum of $7,800. On three subsequent dates additional principal payments were similarly made, bringing the aggregate fund to $9,205.11.

These sums were invested and the income reinvested from time to time with the result that by January 20, 1932, when the *cestui que trust* attained majority and was consequently entitled to payment in full according to the terms of the trust, the fund had approximately doubled.

At the start, all investments were made in New York State and United States government bonds, but as time went on, the trustee demonstrated an increasing predilection for shares of real estate mortgages, commonly designated " participations." During the past three years all reinvestments have been in securities of this type. Three of such investments form the subject of the present attack on the transactions of the trustee. These are as follows: $5,000 participation in bond and mortgage on premises 76 Park Terrace West, New York city, *maturing March 1, 1935;* $100 participation in bond and mortgage on premises 337–343 East Fifty-eighth street, New York city, *maturing May 1, 1935;* and $1,300 participation in bond and mortgage on premises 133–139 Dyckman street, New York city, *maturing November 1, 1935.*

The position of the trustee, in a word, is that since these investments were within the description of sections 111 of the Decedent Estate Law and 21 of the Personal Property Law, the trustee has fully complied with all requirements of law in this regard. The *cestui que trust*, on the other hand, maintains that the investment in securities maturing at times subsequent to that on which she was entitled to distribution was improper.

It is, of course, unquestionable that the Legislature in the enactments referred to has authorized fiduciaries to invest in the classes of securities particularly specified. No authority with which the court is familiar has, however, abrogated the long-standing rule of law, first authoritatively enunciated in *King* v. *Talbot* (40 N. Y. 76, 85), " that the trustee is bound to employ such diligence and such prudence in the care and management [of the trust], as in general, prudent men of discretion and intelligence in such matters, employ in their own like affairs."

Indeed, it has been authoritatively determined that the statutory authorization furnishes a potent protection for an investment only where its making is a prudent and otherwise proper act.

In *Matter of Randolph* (134 N. Y. Supp. 1117, not officially

reported; affd., 150 App. Div. 902) the court in holding improper, by reason of the financial irresponsibility of the mortgagor, an investment in a mortgage which showed the statutory margin over the appraised value, said (at p. 1118): " For many years back, and at present under the statutes of this state (now section 111, Decedent Estate Law; section 21, Pers. Prop. Law), trustees of express trusts to hold and invest are permitted, in the absence of express directions to the contrary, to invest the trust funds in bonds and mortgages on unincumbered real property in this state worth 50 per cent. more than the amount loaned thereon. But such permission, I think, is always coupled with the implied proviso that such loan is to be in other respects reasonable and proper. The surrogate does not understand that this qualification, formerly well understood in Courts of Chancery, is abrogated by the statutes of either England or New York regulating *pro tanto* the investments of trustees. On the contrary, this qualification must be read, as it were, into the statutes." To like effect, see *Durant* v. *Crowley* (197 App. Div. 540, 546; affd., 234 N. Y. 581).

Since it is apparent both on reason and authority that the mere fact of the making of an investment within the description of the statute does not *ipso facto* exonerate the trustee from criticism in respect thereto, the question for determination becomes one of whether the acts of the trustee which are here the subject of challenge were such as would have been performed by " prudent men of discretion and intelligence in such matters, * * * in their own like affairs." ( *King* v. *Talbot, supra.*)

In this examination the language of *King* v. *Talbot (supra)*, in considering the obligations of the trustee in that case, may be of assistance. The court says (at p. 88): " Palpably, then the first and obvious duty was to place that fifteen thousand dollars in a state of security; second, to see to it that it was productive of interest; and, third, *so to keep the fund, that it should always be subject to future recall for the benefit of the cestui que trust.*" (Italics not in original.)

It is the violation of this third clearly defined duty which forms the present basis of complaint of this *cestui que trust*. The trustee has tied up the funds of the trust in such a way that a sum equivalent to almost seventy per cent of the total original principal contribution could not become available to her for between three and four years after she was entitled to receive it according to the terms of the will.

The trustee had actual knowledge, as demonstrated by the affidavit of its vice-president on file in this court, that prior to April 1, 1932, it would be faced by a matured obligation to pay over all of

these sums to the beneficiary. It also knew that such indebtedness could legally be solved as a matter of right only in cash. (*Villard* v. *Villard*, 219 N. Y. 482, 500; *Camp* v. *Smith*, 49 Hun, 100, 105; affd., 117 N. Y. 354.) In spite of this, within fourteen, twelve and nine months respectively of the time when this known obligation must inevitably accrue, it performed these acts of investment which made it an absolute certainty that compliance by it with its legal obligations would be impossible. Is such an act one which would have been performed by a prudent man of discretion and intelligence in his own like affairs? Would a man faced with a maturing mortgage, which he knew could not be renewed, be prudent or display either discretion or intelligence if he voluntarily placed it beyond his power to meet his obligation on the due date?

The present is not a case of an ordinary trust, the time of termination of which was incapable of ascertainment. It was a holding for an infant to terminate on majority. This circumstance placed the trustee substantially in the situation of a guardian of the property of the minor, in which connection, the law has been settled for generations that the property of the infant should not be impounded beyond his majority. (*Ware* v. *Polhill*, 11 Ves. 278; *Ex parte Phillips*, 19 id. 122; 2 Kent Comm. [14th ed.] p. 230; *Matter of Vanderbilt*, 129 Misc. 605, 607; *Matter of Wiener*, N. Y. L. J. Jan. 17, 1933, p. 329; Perry Trusts [7th ed.], § 608.)

Whereas on general principles of law the action of the trustee appears wholly indefensible, the same result is attainable by another process of reasoning based on the directions incorporated in the will itself.

It is primary that the testamentary document supplies the sole charter of authority of the testamentary fiduciary. Where the testamentary intent is plain and contravenes no rule of law or dictate of public policy, it will be effectuated by the courts. Many instances of powers and obligations implied by the necessities of the case are continually arising, the most common of which is perhaps the implication of a power of sale in the fiduciary where the exercise of such an authority is essential to the proper effectuation of the testamentary wish, but no express authority in this regard is included within the confines of the document. Conversely, a general power of sale expressly granted to an executor or trustee is subject to an implied limitation in respect to a particular parcel of property, the life use of which is given to a designated beneficiary.

Applying this principle to the will at bar, the testatrix gave the fund in question to the trustee with directions to accumulate the income and " to pay over and deliver " the principal with accumu-

lations to Elizabeth Blake King on her attaining her majority. In view of the law, hereinbefore noted, requiring such payment to be in cash, the inevitable implication of the direction was that the trustee should so conduct the affairs of the trust that upon the arrival of the designated time, it should be possible for it to comply with the express direction in this regard. Since the trustee, according to its sworn statement, was fully aware of the time when this obligation would mature, the composite effect of the testamentary direction and the law requiring payment in cash, effected a limitation upon the authority of the trustee in respect to the nature of the investments which, consonant with the express testamentary direction, it might make of this particular fund. This limitation was not observed, in consequence of which the objection of the beneficiary in this regard must be sustained.

The reversal of the determination of the Supreme Court decision in *Marczak* v. *Brooklyn City R. R. Co.* (147 Misc. 399) is in no wise pertinent to the facts in this case. The determination of the learned justice at Special Term was to the effect that the chamberlain was culpable by reason of having invested funds deposited with him in exact compliance with the terms of a previous order. No demonstration appears or was presumably capable of proof, that the official had or was chargeable with notice respecting the time when the funds should again be made available. Under such circumstances there was absent from that case the essential distinguishing feature of the case at bar of notice that not all legally authorized investments permitted compliance with his obligations for repayment of the fund. Absent this distinguishing feature, it would seem apparent that his action was not subject to just criticism. That the reversal by the Appellate Division, Second Department, on December 19, 1932, did not enunciate any rule of general application is apparent from the language of its memorandum (237 App. Div. 841): " Order reversed on the law, without costs, and motion denied, without costs. On the facts presented by this record we are of opinion that it cannot be held that the chamberlain acted unreasonably, improperly or negligently in making the investment herein. (*Chesterman* v. *Eyland*, 81 N. Y. 398.) "

There remains for decision merely the objection to the amount of attorneys' fees paid by the trustees for services in connection with this accounting. The charge made and paid in respect to the original account aggregated $575, and additional items of $250 for services and ninety-nine cents for disbursements are inserted to cover the supplemental account. The sole informative matter contained in the latter is to the effect that such additional attorneys'

charges had been paid, that $5.10 additional income had been received and that a participation certificate of a face value of $625 had been sold.

By reason of the views expressed in this opinion, the last-named intelligence possesses slight interest. A charge of $250 for informing the *cestui que trust* that she was entitled to $5.10 more appears somewhat disproportionate. The court can find no justification whatsoever for this additional charge and a credit for its payment is wholly disallowed. In the opinion of the court the original payment was also inordinately high in view of the simplicity of the trust and the fact that this entire controversy was precipitated by the improper actions of the trustee in its administration. This payment will, therefore, be allowed only to the extent of $400 which will cover all services to and including the entry of the final decree.

The account of the trustee will be surcharged by the amount of the improper investments and by the excessive counsel fees as hereinbefore determined.

Proceed accordingly.